**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** : | |
| v. : | Case No. 21-cr-537-JMC |
| **PAUL RUSSELL JOHNSON,** *et al.,* : | |
| **Defendants.** : | |

**REPLY BRIEF IN SUPPORT OF**
**PAUL RUSSELL JOHNSON'S SUPPLEMENTAL MOTION TO SUPPRESS**
**ELECTRONIC EVIDENCE OR, IN THE ALTERNATIVE,**
**TO APPOINT A SPECIAL MASTER**

**INTRODUCTION**

The government contends: 1) that it did not violate the Constitution and 2) that there is no need for an evidentiary hearing to assist the Court in determining whether the government violated the Constitution. The government is mistaken on both issues. Taking the second issue first, the government has doubled down on shielding this case from public view. After 294 days, the government still will not agree with the defense on a trial date. But it is happy to accept a felony guilty plea from Mr. Johnson.[1] It now attempts to push this case further from public view by refusing to have an evidentiary hearing on material and contested factual and legal issues. That position is not supported by the law.

Regarding the Constitution, there are, at least, three key Fourth Amendment issues, which are both factual and legal, stemming from the April 13, 2021 pre-dawn raid of Mr. Johnson's

---

[1] As the President of the National Association of Criminal Defense Lawyers Martin Sabelli recently remarked, the lack of trials and the prevalence of pleas in this country are major drivers of mass incarceration and the inability to check unconstitutional police misconduct. *See* Martin Sabelli, *Truck driver sentenced to 110 years shows hazards of prosecutors manipulating trial system*, USA TODAY, (Jan. 19, 2022, 7:00 AM), https://www.usatoday.com/story/opinion/policing/2022/01/19/truck-driver-sentenced-110-years/9108405002/

property: (1) whether the government executed its Search Warrant at the wrong address; (2) whether the government seized four walkie-talkies[2] by opening a locked safe without a warrant; and (3) whether Mr. Johnson has a privacy interest in the phone seized from Person-1 ("Phone Y"). The government did not have probable cause to search the dwelling upon which it executed the Search Warrant. Also, it did not have probable cause to believe that the items named in the Search Warrant would be found in the locked safe, and thus, it did not have probable cause to open the locked safe. Finally, Mr. Johnson has demonstrated a privacy interest in Phone-Y.

Accordingly, this Court should grant Mr. Johnson's Motion after considering the factual and legal issues developed at an evidentiary hearing with live testimony. If the Court grants a hearing, the parties have already agreed to limit testimony to: 1) three out of the 23 Federal Bureau of Investigation ("FBI") agents who raided Mr. Johnson's family and 2) Mr. Johnson.

## ARGUMENT

I. **The FBI violated the Fourth Amendment by searching an incorrect address for which there was no probable cause.**

   A. **The government searched Address-2, which is not listed on the Search Warrant.**

The Search Warrant in this case authorized the FBI to search the structures located at Address-1. It lists three buildings located at that address: "a white siding, two-story farmhouse, a detached garage, and a white, single-story double wide trailer." Motion to Suppress Electronic Evidence or, in the Alternative, to Appoint a Special Master (hereinafter "Mot. to Suppress"), Ex.

---

[2] The number of walkie talkies taken from the safe is a disputed fact. The government claims—without an affidavit or other admissible evidence—that only three walkie-talkies were taken from the safe. Reply, ECF No. 108 at 7-8. Mr. Johnson contends that four walkie-talkies were taken from the safe. Reply in Support of Mot. to Suppress Ex. 2, Johnson Aff. ¶ 13, ECF No. 97-2. At an evidentiary hearing, the Court can make a credibility determination about the witnesses and use that determination to assist in its evaluation of the law.

2, Maldonado Aff. ¶ 3, ECF No. 96-2. But Mr. Johnson's farmhouse and Mr. Johnson's trailer have different addresses. The farmhouse is located at Address-1. Reply in Support of Mot. to Suppress (hereinafter "Reply") Ex. 1, GIS Map of Properties, ECF No. 97-1. The trailer is located at Address-2. *Id.* Mr. Johnson and his family live at Address-2. No one lives at Address-1. In an attempt to justify this error after the fact, the government contends that Address-1 is the actual address for all the structures on Mr. Johnson's properties, including his trailer (i.e., Address-2, which Mr. Johnson's residence). *Id.*

Mr. Johnson—not the government—first provided evidence to the Court of the two addresses. The government takes issue with the Geographic Information System ("GIS") map provided by Mr. Johnson. Government's Opposition to Mot. to Suppress (hereinafter "Opp'n"), ECF No. 108 at 9. The GIS map shows that Address-1 (Mr. Johnson's farmhouse) and Address-2 (Mr. Johnson's trailer and residence) are separate buildings with separate addresses. Reply Ex. 1, GIS Map of Properties, ECF No. 97-1. The government wrongly states that the GIS map is the "only evidence" that the trailer is located at a separate address. To the extent the government doubts there are two addresses, then this Court should add that factual issue to the list of factual disputes that need to be resolved via an evidentiary hearing.[3]

According to the Fourth Amendment, "no Warrants shall issue, *but upon probable cause*, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV. Because Address-2 is a separate unit from Address-1, there must be separate probable cause to search it. *United States v. Cannon*, 264 F.3d

---

[3] In relying on certified County-1 real estate property records, the government creates another factual issue for an evidentiary hearing before this Court. It is unclear what the government knew on April 13, 2021 about the property (or "SUBJECT RESIDENCE") before it raided Mr. Johnson's family. What the government knew about the property is a factual issue that goes to the Court's probable cause determination and can only be determined at an evidentiary hearing.

3

875, 879 (9th Cir. 2001) ("[W]hen law enforcement wishes to search two houses or two apartments, it must establish probable cause as to each.") (citations omitted). Here, the Search Warrant established probable cause for and authorized the search of Address-1 alone.

The explicit mention of Address-2 is conspicuously absent in the Search Warrant. The Search Warrant does not establish probable cause to search Address-2, which is the trailer that is Mr. Johnson's home. The Affidavit incorrectly describes the "SUBJECT RESIDENCE" to be searched as the "property located at [Address-1], which is further described as three structures on 13.76 acres which include a white siding, two-story farmhouse, a detached four-car garage, and a white single-story double wide trailer." Mot. to Suppress Ex. 2, Maldonado Aff. at 52, ECF No. 96-2. Although it mentions these individual structures, it does not contain any averments referencing the individual structures. This is the key problem. The Affidavit states that FBI agents observed Mr. Johnson "leaving the SUBJECT RESIDENCE." Mot. to Suppress Ex. 2, Maldonado Aff. ¶ 70, ECF No. 96-2. It also mentions that FBI agents saw two automobiles registered to Mr. Johnson "at the residence," and that local law enforcement made contact with a woman believed to be Person-1 at the Subject Residence. *Id.* at ¶¶ 67–69. The Affidavit does not specify which of the three structures:  1) the government surveilled Mr. Johnson leaving; 2) the government noted parked vehicles; and 3) the government contacted Person-1.

The government argues that "so long as there was probable cause to believe that [Mr. Johnson] resided in at least one of the structures located at Address-1, then there was probable cause to search all the structures on the property." Opp'n, ECF No. 108 at 12. But if, as Mr. Johnson argues, the trailer and the farmhouse are located at two different addresses, then the government's cited cases are inapplicable. *See, e.g., United States v. Alexander*, 761 F.2d 1294, 1301 (9th Cir. 1985) (explaining the conditions under which a warrant that "authorizes the search of a [single]

4

*street address* with several dwellings" is valid) (emphasis added) (citation omitted); Opp'n, ECF No. 108 at 12.

### B. There is a factual dispute about whether the government had probable cause to search Address-2 (Mr. Johnson's residence).

"The practical accuracy rather than technical precision governs in determining whether a search warrant adequately describes the premises to be searched." *United States v. Williams*, 687 F.2d 290, 292 (9th Cir. 1982). In the D.C. Circuit, the "relevant concerns" for assessing the validity of a warrant with an incorrect address are: "(1) whether the description is sufficient to enable the executing officer to locate and identify the premises with reasonable effort, and (2) whether there is any reasonable probability that another place might be searched mistakenly." *United States v. Johnson*, 437 F.3d 69, 73 (D.C. Cir. 2006).

At the very least, there is a factual dispute about whether the Search Warrant satisfies these two *Johnson* factors. The Affidavit's description of the Subject Residence is too general. Although it lists the three buildings to be searched, it omits the fact that one of the buildings is located at a separate address. Mot. to Suppress Ex. 2, Maldonado Aff. ¶ 3, ECF No. 96-2 (describing three buildings located at Address-1). Not only was there a "reasonable probability that another place might be searched mistakenly," that is indeed what happened when the agents searched Address-2. *Johnson*, 437 F.3d at 73. The Affidavit's account of FBI surveillance further muddies the waters. It mentions that agents observed Mr. Johnson leaving the Subject Residence, but it fails to specify which of the three buildings Mr. Johnson reportedly left. Mot. to Suppress Ex. 2, Maldonado Aff. ¶ 70, ECF No. 96-2. This raises the obvious factual question of which building the government reportedly observed Mr. Johnson leaving. It also undermines the government's claim of probable cause to search all three buildings on the property. For example, if FBI agents only observed Mr. Johnson leaving the building associated with Address-1, then there would not be probable cause

to search Address-2. Resolving this key factual question is fertile ground for an evidentiary hearing, so that this Court can make a legal determination about whether the government had probable cause to search the wrong address (i.e., Address-2, which is never explicitly mentioned in the Search Warrant).

In *Whitten*, the Ninth Circuit held that "a warrant may authorize a search of an entire street address while reciting probable cause as to only a portion of the premises if they are occupied in common rather than individually, if a multiunit building is used as a single entity, if the defendant was in control of the whole premises, or if the entire premises are suspect." *United States v. Whitten*, 706 F.2d 1000, 1008 (9th Cir. 1983) (citing *United States v. Gilman*, 684 F.2d 616, 618 (9th Cir.1982). But if none of those conditions are met, then "[w]hen a structure is divided into more than one residential unit, or where two residences are located on a single parcel of property, there must be cause to search each unit." *Id.* citing *United States v. Whitney*, 633 F.2d 902, 907 (9th Cir.1980), *cert. denied*, 450 U.S. 1004, 101 (1981). Aside from Mr. Johnson's argument that the farmhouse (Address-1) and the trailer (Address-2) are located at different addresses, as discussed above, the Affidavit is devoid of any statements pertaining to the specific three buildings to be searched. The Affidavit is so general that there are factual disputes as to: 1) whether the three buildings were occupied in common or individually, 2) whether the three buildings are considered a single entity or separate entities, 3) whether Mr. Johnson controlled all three buildings, 4) whether all three buildings were suspect. *Whitten*, 706 F.2d 1000 at 1008. The Affidavit's assertions are simply too general to draw any conclusions about probable cause to search the individual three structures. *See Smith v. Grays Harbor Cty.*, No. C05-5090RBL, 2006 WL 126492, at *7 (W.D. Wash. Jan. 17, 2006) (determining that observation that individual had been seen

"having access to the other buildings" was insufficient to establish probable cause to search those buildings, especially when officers knew individual was residing in one of the other buildings).

## II.     The FBI's seizure of four walkie-talkies from a locked safe violated Mr. Johnson's Fourth Amendment rights.

### A.  The FBI did not have probable cause to open the locked safe.

Regardless of whether the FBI needed a warrant to open the locked safe in Mr. Johnson's bedroom, the FBI agents did not have probable cause to believe that incriminating items would be found inside the safe. Searches must be limited "to the specific areas and things for which there is probable cause to search." *United States v. Maxwell*, 920 F.2d 1028, 1031 (D.C. Cir. 1990) (quoting *Maryland v. Garrison*, 480 U.S. 79, 84 (1987)). The Affidavit states that there was "probable cause" to believe that the following items could be found at the "SUBJECT RESIDENCE":

- Clothing and accessories worn by Mr. Johnson and Person-1. Mot. to Suppress Ex. 2, Maldonado Aff. ¶ 71, ECF No. 96-2.

- Hotel, travel receipts, and "additional evidence of the Subjects' motive, planning, coordination, intent, and travel to Washington, D.C." *Id.* ¶ 72.

- Physical and or electronic evidence of the offenses Mr. Johnson is charged with, such as additional videos. *Id.* ¶ 73.[4]

---

[4] Attachment B to the Affidavit provides a non-exhaustive laundry list of items akin to a general warrant and does not explicitly state that there is probable cause for this non-exhaustive list. Mot. to Suppress Ex. 2, Maldonado Aff., Attachment B ¶ 1, ECF No. 96-2. Of course, it makes sense that there would not be probable cause for things not even mentioned in the non-exhaustive list. The very last line of Attachment B requests to open "locked safes, boxes, and compartments." *Id.* at 59. But again, there is no argument that the non-exhaustive list of items seized would be found in a locked safe. The language is tacked on at the end of Attachment B in a boilerplate fashion. By comparison, in a typical gun-drug case, the government makes a probable cause argument in the search warrant affidavit for opening a safe. It did not do so here.

It is unreasonable for the FBI agents to believe that they would find any of these items within their warrantless search of Mr. Johnson's safe. The Affidavit does not state that the above-listed items could be found in a safe—locked or unlocked. None of them are items that are typically stored in a safe.[5] The affidavit does not mention guns, cash, or other items that are typically stored in a safe (including items of value or important documents). One might expect to find in a safe "drugs, money associated with drug trafficking, and drug paraphernalia," *United States v. Lengen*, 245 F. App'x 426, 434 (6th Cir. 2007), or ammunition, *United States v. Frost*, No. 08-CR-113-GKF-TLW, 2011 13300566, at *5 (N.D. Okla. Feb. 28, 2011). But not clothing or old travel and hotel receipts. Thus, there is a factual dispute as to why the government believed that it had probable cause to believe that items such as clothing or travel and hotel receipts for a protest occurring over four months ago would be found in a locked safe. The government has provided zero evidence that on April 13, 2021, it had probable cause to believe that clothing and receipts from January 6, 2021 would be found in its warrantless search of a locked safe on April 13, 2021.

The Government cites a page's worth of out-of-circuit cases for the proposition that a lawful search of a premises allows the search of all containers on the premise. *See* Opp'n, ECF No. 108 at 14–15. The government misses the point. This case is not a gun case or a drug case. This is a case about whether Mr. Johnson engaged in a lawful protest on Jan. 6 or committed protest-related crimes on Jan. 6. Accordingly, not one of the government's nine cases holds that law enforcement can enter the house of an alleged unlawful protestor and open a locked safe

---

[5] The government citation to Mr. Johnson's affidavit concerning his storage of walkie-talkies in a safe is another reason why there needs to be an evidentiary hearing. It is unreasonable to believe that Mr. Johnson would have evidence of a protest, which had occurred four months ago, locked in a safe. There is a credibility determination that the Court must make regarding the government's claim (which is unsupported by an affidavit) that it reasonably believed that it had probable cause to search a safe some four months after January 6 for evidence of a crime on January 6.

8

without separate probable cause (or a warrant). *Cf. Arizona v. Gant*, 556 U.S. 332, 347 (2009) (holding that police cannot open, without separate probable cause, a container inside a car during a traffic stop) *with United States v. Vinton*, 594 F.3d 14, 25 (D.C. Cir. 2010) (holding that officer permitted to search locked suitcase for guns only when it was reasonable to believe that it might contain evidence relevant to the crime of gun possession).

### B.  Whether the safe was locked is another factual dispute for a hearing.

The government contends, without an affidavit, that the safe was "unlocked." It then engages in conjecture, speculation, and conclusion—not admissible evidence—to support its argument that the safe was unlocked. *See* Opp'n, ECF No. 108 at 15–16. Despite the government's incorrect belief that whether the safe was locked is immaterial, *see supra* at Argument I(A), the safe was locked. Reply Ex. 2, Johnson Aff. ¶ 14–15, ECF No. 97-2. Only at an evidentiary hearing can the Court determine, by listening to the government's witnesses and the defense's witness, whether the safe was locked. If the safe was locked, then the government lacked probable cause (or a warrant specific to the safe) to open it.

### III.     The FBI's seizure of Phone Y violated Mr. Johnson's Fourth Amendment rights.

Mr. Johnson has a subjective and legitimate expectation of privacy in the contents of Phone Y—the cell phone the government seized from Person-1. The government's analysis conflates Mr. Johnson's "subjective" expectation of privacy and his "reasonable" expectation of privacy. These two prongs are "two discrete questions." *Smith v. Maryland*, 442 U.S. 735, 740 (1979). A subjective expectation of privacy exists when one "seeks to preserve [something] as private." *Id.* quoting *Katz v. United States*, 389 U.S. 347, 351 (1967) (Harlan, J., concurring). A "reasonable" or "legitimate" expectation of privacy exists when an individual's expectation is "one that society

is prepared to recognize as 'reasonable,'" *id.* at 361, or "justifiable under the circumstances," *Smith*, 442 U.S. at 740.

As an initial matter, the government misunderstands the difference between a subjective expectation of privacy and a reasonable expectation of privacy. A subjective, or actual, expectation of privacy depends on one's internal experience—whether an individual believes that their actions are concealed from others. But a reasonable or legitimate expectation of privacy "by definition means something more than a subjective expectation of not being discovered." *Rakas v. Illinois*, 439 U.S. 128, 143 n.12 (1978). It refers to the understandings of privacy that are recognized or permitted by society. *See id.* (illustrating the difference by explaining that a burglar stealing from an unoccupied summer cabin may have a subjective expectation of privacy but not an objective one).

In arguing that Mr. Johnson does not have a subjective expectation of privacy in the information on Phone-Y, the government cites cases—no evidence—relevant to the determination of a reasonable expectation of privacy. *See* ECF No. 108 at 17 ("Johnson asserts seven facts as evidence of his subjective expectation of privacy in Person-1's phone."). The cases the government cites in this section bear that out. *See United States v. Beaudion*, 979 F.3d 1092, 1099 (5th Cir. 2020) (analyzing defendant's use of girlfriend's phone as evidence of his reasonable privacy expectations in the information contained therein); *Smith*, 442 U.S. at 743 (noting that voluntarily turning information over to telephone company negated defendant's claim to a "reasonable" or "legitimate" expectation of privacy); *United States v. Miller*, 425 U.S. 435, 442 (1976) (assessing the "nature of the particular documents sought to be protected in order to determine whether there is a legitimate 'expectation of privacy' concerning their contents.").

Mr. Johnson maintained a subjective expectation of privacy in the information on Phone-Y. The precautions he took to shield his private information contained on Phone-Y demonstrate that. *See United States v. Burnett*, 890 F.2d 1233, 1239 (D.C. Cir. 1989) (analyzing precautions taken to protect privacy, rather than nature of the information at issue, as indicia of subjective expectation of privacy).

Mr. Johnson's subjective expectation of privacy in the information on Phone-Y was also objectively reasonable. This is not like *Smith*, *Miller*, or even *Carpenter* where an individual voluntarily shared the information with corporate entity. There, the individuals "take[] the risk, in revealing [their] affairs to another, that the information will be conveyed by that person to the Government." *Miller*, 425 U.S. at 443. Here, the "other" is Person-1—Mr. Johnson's wife. It does not make sense that Mr. Johnson has standing to challenge a warrant for information he "shared" with an anonymous third-party corporate entity but that he has no recourse to challenge a warrant for information he shared with his wife in the contexts of their marriage and their business.

Further, in *Beaudion*, there was "no indication that [the defendant] ever used or possessed the phone outside of [his girlfriend's] presence. *Beaudion*, 979 F.3d at 1099. When Mr. Johnson cannot use Phone X, he uses Phone Y to manage his personal and business affairs. He is not in Person-1's presence every moment of every day when he uses Phone Y for this purpose. Reply Ex. 2, Johnson Aff. ¶ 10, ECF No. 97-2. The *Beaudion* Court also noted that although the defendant bought the phone, his girlfriend's parents paid the monthly bill. *See Beaudion*, 979 F.3d at 1099. Not so here—Mr. Johnson bought Phone Y and pays the monthly bills for it, including the month of April 2021 when the FBI seized Phone Y. Reply Ex. 2, Johnson Aff. ¶ 4, ECF No. 97-2.

Finally, the government offers no evidence to undermine Mr. Johnson's reasonable expectation of privacy in Phone Y. The question of Mr. Johnson's reasonable expectation of

privacy requires both a factual and legal analysis. Without an evidentiary hearing, then the government must concede the factual part of the analysis.

**IV.     A filter team does not adequately protect Mr. Johnson's privileged and work-product communications with his lawyers.**

The government maintains its position that the use of a filter team is a fair and acceptable method of protecting privileged materials in this case. *See* Opp'n, ECF No. 108 at 23–24. In support of this argument, it insists that the cases Mr. Johnson cites to support the appointment of a Special Master are inapposite because they involve searches of law offices. *See* Opp'n, ECF No. 108 at 24. The distinction between law offices and other locations where protected communications can be found is not meaningful.

The work-product doctrine is a privilege "held by lawyer and client alike," and applies to materials prepared by an attorney for their client in anticipation of litigation. *In re Search Warrant Issued June 13, 2019*, 942 F.3d 159, 174 (4th Cir. 2019). Attorney-client privilege "empowers a client—as the privilege holder—'to refuse to disclose and to prevent any other person from disclosing confidential communications between him and his attorney.'"). *Id.* at 173 (citing *Black's Law Dictionary* 129 (6th ed. 1990)). The Sixth Amendment's guarantee of effective assistance of counsel undergirds both these privileges—an attorney cannot provide effective assistance if their client cannot speak freely and honestly with them. *See id.* at 174. This rationale applies equally to all privileged communications, no matter where they are located. Law firms do not hold a heightened status in the law where privileged communications are more protected. The holding of *In re Search Warrant* does not center the place searched; it states simply that "a court is not entitled to delegate its judicial power and related functions to the executive branch, especially when the executive branch is an interested party in the pending dispute." *Id.* at 176. Privilege determinations are a judicial function, not an executive function. *See id.* The government *qua* filter team cannot

play judge. To allow a filter team would leave "the government's fox in charge of guarding [Mr. Johnson's] henhouse." *Id.* at 177.

Mr. Johnson has identified categories of documents on the Subject Devices that he believes to be privileged; therefore, the Court should appoint a Special Master rather than accede to the government's request. In the civil context, with typically only money at stake, one's adversary is not allowed to make privilege determinations. *See United States v. Deloitte LLP*, 610 F.3d 129, 133 (D.C. Cir. 2010) (remanding case for district court to make a privilege determination based on in camera review of document); *cf.* Fed. R. Civ. P. 26 (describing how court makes the privilege determination when a party mistakenly produces allegedly privileged material). In the criminal context where one's liberty is at stake, it stands to reason that one's adversary ought not make privilege determinations.

## V.  An evidentiary hearing is necessary to resolve the factual and legal issues.

Mr. Johnson's Motion to Suppress cannot be resolved on the papers alone because, as elaborated upon above, "the question of whether to suppress evidence hinges on the resolution" of material facts. *United States v. Harris*, No. 19-358 (RC), 2021 WL 1167263, at *4 (D.D.C. Mar. 26, 2021) (citing *United States v. Law*, 528 F.3d 888, 904 (D.C. Cir. 2008)). As the government recognizes, if the Court were to find that the Search Warrant for the Subject Devices was overbroad, "the parties would likely need an evidentiary hearing in order to probe whether [Mr. Johnson] had a subjective [sic] expectation of privacy" in Phone-Y. Opp'n, ECF No. 108 at 23. Further, whether the FBI agents should have known from the warrant that they searched the wrong address is a factual issue. Similarly, testimony from the FBI agents will establish whether they exhibited flagrant disregard for the terms of Search Warrant by seizing the walkie-talkies from the safe.

## **CONCLUSION**

WHEREFORE, for the reasons stated above and those reasons stated in Mr. Johnson's previous filings on these issues, Mr. Johnson respectfully requests that the Court suppress all evidence unlawfully seized from the wrong address—Address 2—via the Search Warrant, dated April 12, 2021. Should the Court determine, at an evidentiary hearing, that the Search Warrant authorized the search of the wrong address, then the Court should: 1) suppress the seizure of the desktop computer, the HD cameras , and the walkie-talkies (found in the locked safe) because the Search Warrant did not authorize such a seizure and 2) and suppress the cell phones seized because the Search Warrant is unconstitutionally overbroad and unreasonable.

Alternatively, Mr. Johnson requests that the Court appoint a neutral special master to review and segregate documents and communications that are protected by attorney-client privilege or the work product doctrine.

Dated: February 18, 2022

Respectfully submitted,

_____ */s/*
Kobie Flowers (Bar No. 991403)
BROWN GOLDSTEIN & LEVY, LLP
1717 K Street, NW, Suite 900
Washington, DC 20006
Tel: (202) 742-5969
Fax: (202) 742-5948
kflowers@browngold.com

Monica Basche (Bar No. MD0105)
BROWN GOLDSTEIN & LEVY, LLP
120 E. Baltimore Street, Suite 2500
Baltimore, Maryland 21202
Tel: (410) 962-1030
Fax: (410) 385-0869
mbasche@browngold.com

*Counsel for Paul Russell Johnson*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that I caused a copy of this pleading was served on all counsel of record via the Court's electronic filing service.

*/s/ Kobie Flowers*
Kobie Flowers

Date: February 18, 2022