IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 1:21-cr-537 (JMC) |
| | ) | |
| PAUL JOHNSON, | ) | |
| Defendant. | ) | |
| _____ | ) | |

<u>MR. JOHNSON'S MOTION FOR TRANSFER OF VENUE</u>

Paul Johnson, through counsel and pursuant to Fed. R. Crim. P. 21(a), respectfully requests that this Court transfer the proceedings outside of the District of Columbia.

A central premise of our trial system "is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print." *Skilling v. United States*, 561 U.S. 358, 378 (2010) (quoting *Patterson v. Colorado ex rel. Attorney General of Colo.,* 205 U.S. 454, 462 (1907)). The Constitution guarantees the right to a fair trial by an impartial jury, Const. amends. V & VI, and to safeguard this right, the Court should transfer Mr. Johnson's case to another district. Here is why:

*First*, the size and demographics of the D.C. jury pool, as well as the potential jurors' connection to the events and aftermath of January 6, give rise to a potential pool of jurors that are neither impartial nor indifferent to the allegations in this case.

1

*Second*, the nature and volume of the media coverage surrounding this case, to a population particularly interested in the events of January 6, weighs in favor of a change of venue.

*Third*, despite the passage of time since the allegations in this case arose, the medica coverage has remained pervasive and persistent.

*Fourth*, data confirms that D.C. residents are uniquely biased against January 6 defendants in ways that *voir dire* cannot be expected to cure.

## ARGUMENT

Both the Fifth Amendment's Due Process Clause and the Sixth Amendment's Jury Trial Clause guarantee the right to a fair trial by an impartial jury. Const. amends. V & VI; *see also Skilling v. United States*, 561 U.S. 358, 378–79 (2010). While ordinarily a trial is held in "the State and district wherein the crime shall have been committed," U.S. Const. amend. VI, "if extraordinary local prejudice will prevent a fair trial—a 'basic requirement of due process'"—then "[t]he Constitution's place-of-trial prescriptions . . . do not impede transfer of the proceeding to a different district at the defendant's request," *Skilling*, 561 U.S. at 378 (quoting *In re Murchison*, 349 U.S. 133, 136 (1955)). Where "so great a prejudice against the defendant exists in the [venue] district that the defendant cannot obtain a fair and impartial trial there," a court "*must transfer* the proceeding . . . to another district." Fed. R. Crim. P. 21(a) (emphasis added); *see also Skilling*, 561 U.S. at 378.

Moreover, in "the extreme case," *Skilling*, 561 U.S. at 381, where "[the] trial atmosphere [has been] utterly corrupted by press coverage," *id*. at 380 (quoting

*Murphy v. Florida*, 421 U.S. 794, 798–99 (1975)), a court must *presume* prejudice from the pretrial publicity. Unlike "actual prejudice," which can only be confirmed through *voir dire*, *see id*. at 385–95, presumed prejudice presents a threat to due process that cannot be negated by jurors' *voir dire* responses. *See id*. at 379 (noting that because of presumptive prejudice in *Rideau v. Louisiana*, 373 U.S. 723 (1963), the Court "d[id] not hesitate to hold, without pausing to examine a particularized transcript of the voir dire," that trial in the contested venue violated due process (quoting *Rideau,* 373 U.S. at 727)). In *Skilling*, the Supreme Court identified three factors for the lower courts to consider in deciding whether a presumption of prejudice is warranted[1]: (1) the size and composition of the community the jury is drawn from, (2) the pervasiveness and tenor of media coverage, and (3) the length of time between the relevant events and trial. *Id*. at 382–83.

Here, the size and characteristics of the District of Columbia jury pool; the nature of the January 6 media coverage; and the time period between Mr. Johnson's arrest and trial—especially when considering the continuous media coverage that January 6 and related proceedings have received—are such that a presumption of juror prejudice exists. Moreover, survey data confirms that the jury pool in the

---

[1] Though not relevant here, the Court also identified a fourth factor for consideration upon appellate review, following trial in the contested venue: (4) whether the jury convicted the defendant on all counts or only on a subset of counts. *Skilling*, 561 U.S. at 383-84. The lack of uniformity in result after denial of a motion to transfer venue, the Court observed, indicates that the jury was impartial and capable of rendering a verdict on only the facts presented, rather than preconceived notions of guilt. *Id*.

District of Columbia is uniquely prejudiced against January 6 defendants to a degree not seen elsewhere.

## I.    The pool of potential jurors in this District is small, geographically compact, and saturated with ties to the federal government.

The nature of the jury pool in the District of Columbia—including its small size, the expansive connection of D.C. residents to the federal government via employment, and the acute impact that January 6 had on those living within its bounds—requires a presumption of juror prejudice to attach in this case.

The Supreme Court in *Skilling* concluded that "the size and characteristics of the community in which the crime occurred" militated against a presumption of prejudice. *Skilling*, 561 U.S. at 382. There, the defendant was a former executive at Enron during that company's notorious accounting scandal, and the community, Houston, had "more than 4.5 million individuals eligible for jury duty[.]" *Id*. The Court observed that, "[g]iven this large, diverse pool of potential jurors, the suggestion that 12 impartial individuals could not be empaneled is hard to sustain." *Id*. Coincidentally, the Court offered as a favorable comparison its conclusion in a prior case that the "potential for prejudice [was] mitigated by the size of . . . 'metropolitan Washington [D.C.][.]'" *Id*. (citing *Mu'Min v. Virginia*, 500 U.S. 415, 429 (1991)). But the *Mu'Min* Court referred to "the metropolitan Washington statistical area, which has a population of over 3 million," 500 U.S. at 429—not to D.C. itself.

4

In fact, the District of Columbia is one of the smallest major U.S. cities, with a population under 700,000.[2] The District's juror pool is certainly larger than the 150,000-person population of the Louisiana parish in *Rideau*. *See Skilling*, 561 U.S. at 382. But D.C.'s entire population resides in a space of just 61.13 square miles.[3] With the Capitol Building near the geographic center, all of the District's residents live within relatively close proximity to the site.[4] Further, the impact of the events of January 6 on the residents of the District of Columbia were felt more directly, and were far more widespread, than that of Enron in Houston, affecting a far greater share of residents than the conduct at issue in *Skilling*.

First, as the Court is no doubt aware, a large proportion of District of Columbia residents either work for the federal government themselves or have friends or family who do. A 2021 survey estimated that 26.7% of D.C. residents work for the government (defined to include local, state, or federal government).[5] More specifically, as of September 2017, the U.S. Office of Personnel Management reported that there are just shy of 600,000 federal civil workers and annuitants in the greater

---

[2] *See 2020 Census Data Shows DC's Population Growth Nearly Tripled Compared to Previous Decade*, D.C. Government Website (Apr. 26, 2021) (D.C. population recorded by census as 689,545) [2020 Census Data Shows DC's Population Growth Nearly Tripled Compared to Previous Decade | DC](#)

[3] U.S. Census Bureau, District of Columbia – Quick Facts, [U.S. Census Bureau QuickFacts: District of Columbia, District of Columbia; District of Columbia](#) (last visited Oct. 27, 2022).

[4] *See* [U.S. Capitol Building | Architect of the Capitol (aoc.gov)](#) (showing a map of the capital building) (last visited Oct. 28, 2022).

[5] U.S. Census Bureau, American Community Survey – Selected Economic Characteristics, [DP03: SELECTED ECONOMIC... - Census Bureau Table](#) (last visited Oct. 28, 2022.

D.C. area (excluding postal workers, Federal Bureau of Investigation workers, and staff on several federal commissions).[6] Nearly 200,000 of those workers and annuitants are within the District itself. *Id*. With a total population of around 690,000, it seems clear that any given member of the District jury pool has a greater likelihood of being closely connected to the federal government than those in comparable metro areas. In fact, as of 2019, according to the D.C. Policy Center, *active* federal employment (including postal workers) accounted for nearly a third of all jobs in the District itself.[7] And of course, for each federal worker, there are many friends and family members who are closely connected to the federal government by proxy.

Further, nearly 15,000 individuals work for Congress directly, and many more residents have friends and family who do.[8] This means that a significant proportion of District of Columbia residents have compelling and unique connections with individuals or institutions that were affected by the events of January 6. Such connections are not likely to be present in any other comparable district. These District residents closely connected to the government are more likely to view themselves as direct victims of the events.

---

[6] Policy, Data, Oversight, *Federal Civilian Employment*, U.S. Office of Personnel Management (Sept. 2017), Federal Civilian Employment (opm.gov) (last visited on Oct. 27, 2022).

[7] *Trends in Federal Employment in DC,* D.C. Policy Center (Mar. 28, 2019), Fed-jobs-role-in-DC-economy.png (1000×800) (dcpolicycenter.org) (last visited Oct. 27, 2022).

[8] *Vital Statistics on Congress*, Brookings Institute (July 11, 2013), Vital-Statistics-Chapter-5-Congressional-Staff-and-Operating-Expenses_UPDATE.pdf (brookings.edu).

Second, though the events of January 6 have garnered huge volumes of press nationally, the fact remains that they affected D.C. residents far more acutely. Washingtonians recall the day and its immediate aftermath with descriptions of fear, devastation, and sadness.[9]  Such views reflect a shared set of experiences on the part of District residents: the Mayor declared a state of emergency for more than two weeks after January 6, implemented a city-wide curfew, restricted access to certain roads and bridges, and discouraged out-of-towners from attending the Presidential Inauguration on January 20 because of road closures and heightened security.[10] District neighborhoods were occupied by the Metropolitan Police and over 25,000 military personnel in the weeks that followed.[11]  And, as D.C. residents are

---

[9] Hector Arzate, et al, *'It Was An Attack On Our Hometown': How 11 Washingtonians Remember The Insurrection,* DCist (Jan. 5, 2022), A Year After Jan. 6, Washingtonians Reflect On The Insurrection | DCist; *D.C. Resident Who Gave BLM Protesters Refuge Condemns 'Atrocities' at U.S. Capitol*, CBC (Jan. 7, 2021), D.C. resident who gave BLM protesters refuge condemns 'atrocities' at U.S. Capitol | CBC Radio.

[10] *Mayor Bowser Orders Citywide Curfew Beginning at 6PM Today*, DC.gov (Jan. 6, 2021), Mayor Bowser Orders Citywide Curfew Beginning at 6PM Today | mayormb (dc.gov); *Mayor Bowser Issues Mayor's Order Extending Today's Public Emergency for 15 Days*, DC.gov (Jan 6, 2021) Mayor Bowser Issues Mayor's Order Extending Today's Public Emergency for 15 Days | mayormb (dc.gov); Jane Recker, *DC Mayor Says Americans Should Not Come to Washington for the Inauguration*, Washingtonian (Jan. 11, 2021), DC Mayor Says Americans Should Not Come to Washington for the Inauguration - Washingtonian; *see also* Laurel Wamsley, *A Timeline Of Security Response At The Capitol On Jan. 6*, WAMU (updated Feb. 23, 2021) (documenting the Capitol complex lockdown and curfews implemented by the Mayor), What We Know About Security Response At Capitol on January 6 : NPR.

[11] Ellen Mitchell, *Army: Up to 25,000 National Guard in DC for Biden Inauguration*, The Hill (Jan. 15, 2021), DC Mayor Says Americans Should Not Come to Washington for the Inauguration - Washingtonian (thehill.com)

particularly aware, the aftershocks of January 6 continue to reverberate in concerned communities.[12]

The impact of the events of January 6 were felt by a far greater proportion of the residents of this district as compared to any other district and felt much more personally and viscerally. Accordingly, the events of January left District of Columbia residents—and therefore the jury pool—neither impartial nor indifferent.

**II.   The nature and volume of media coverage, including televised investigations, have been pervasive and persistent.**

If pervasive pretrial publicity has "inflamed passions in the host community" and "permeat[es] the trial setting . . . [such] that a defendant cannot possibly receive an impartial trial," the district court must presume local prejudice and transfer the proceeding. *See United States v. Quiles-Olivo*, 684 F.3d 177, 182 (1st Cir. 2012); *see also Sheppard v. Maxwell*, 384 U.S. 333, 362 (1966) ("Due [P]rocess requires that the accused receive a trial by an impartial jury free from outside influences."). This is especially true where publicity is both extensive and sensational in nature. *Quiles-Olivo*, 684 F.3d at 182. That said, observing that "prominence does not necessarily produce prejudice, and juror impartiality does not require ignorance," the Supreme Court has repeatedly rejected claims of prejudice that rely exclusively on negative but dispassionate media reporting. *Skilling*, 561 U.S. at 358 (citing *Irvin*, 366 U.S. at

---

[12] *See* Joe Heim, *As Jan. 6 anniversary approaches, fear, disbelief and anger still felt in Capitol Hill neighborhood*, The Washington Post (Jan. 4, 2022), A year after Jan. 6 attack, Capitol Hill neighborhood still feels the effects - The Washington Post; Jonathan Weisman and Matthew Rosenberg, *Washington, D.C., on Edge Over Protest of Jan. 6 Arrests*, N.Y. Times (Sept. 18, 2021), Washington, D.C., on Edge Over Protest of Jan. 6 Arrests - The New York Times (nytimes.com)

722). Something more, such as charged rhetoric or the reporting of gruesome details, is needed to establish prejudice. *See id.* (rejecting the argument that media coverage was prejudicial where "media coverage, on the whole, had been objective and unemotional, and the facts of the case were neither heinous nor sensational").

"Something more" exists when the media coverage is particularly inflammatory, and where it pervades the court proceedings. *See Murphy*, 421 U.S. at 799 ("In those cases the influence of the news media, either in the community at large or in the courtroom itself, pervaded the proceedings."); *see also id.* ("[P]roceedings in these cases were entirely lacking in the solemnity and sobriety to which a defendant is entitled."). In *Skilling*, the Court noted that presumed prejudice could arise from media coverage that "readers or viewers could not reasonably be expected to shut from sight" as jurors. 561 U.S. at 382. This is precisely the case concerning January 6 coverage, given both the amount of coverage and its often sensational content.

The January 6 events at the Capitol have been ascribed once-in-a-generation infamy in media coverage and, indeed, in public discourse. At a one-year anniversary observance,

> [Vice President Kamala] Harris compared the Jan. 6 insurrection to two other dates when the United States came under attack: Dec. 7, 1941, when the Japanese bombed Pearl Harbor, and Sept. 11, 2001, when terrorists turned commercial airplanes into missiles and attacked the World Trade Center and the Pentagon.
>
> "Certain dates echo throughout history, including dates that instantly remind all who have lived through them where they were and what they were doing when our democracy came under assault,"

Harris said. "Dates that occupy not only a place on our calendars but a place in our collective memory."[13]

The Vice President was hardly the first to draw such a parallel, or to otherwise use such charged language in characterizing the events of January 6. President Biden referred to those involved in the January 6 events as "a group of thugs, insurrectionists, political extremists, and white supremacists."[14] Similarly, representative Cori Bush called the January 6 incident "a white supremacist insurrection" and a "domestic terror attack."[15]

Of particular significance in this case, is the televised, carefully produced, primetime coverage of the House Select Committee's investigative efforts.[16] This coverage featured U.S. Capitol Police Officer, C.E, who testified before the Select Committee in June of this year and will presumably be a central government witness at trial. This officer's graphic, televised, description of January 6—which includes

---

[13] Annie Linskey, *Biden Goes After Trump for Lies and Self-Aggrandizement in Jan. 6 Insurrection Anniversary Speech*, Wash. Post (Jan. 6, 2022), Biden blasts Trump in Jan. 6 anniversary speech - The Washington Post.

[14] *Remarks by President Biden at Signing of an Executive Order on Racial Equity*, White House (2021), Remarks by President Biden at Signing of an Executive Order on Racial Equity - The White House

[15] *Rep. Cori Bush Calls Trump 'White Supremacist-in-Chief'*, NBC4 Washington (Jan. 13, 2021), Rep. Cori Bush Calls Trump 'White Supremacist-in-Chief' – NBC4 Washington (nbcwashington.com).

[16] *See* Sarah Ellison, Jacqueline Alemany and Josh Dawsey, *The Subtle Statecraft Behind the Jan. 6 Hearings*, Wash. Post (June 23, 2022), James Goldston and the stagecraft of the January 6 committee hearings - The Washington Post; Annie Karni, *The Committee Hired a TV Executive to Produce the Hearings for Maximum Impact*, N.Y. Times (June 9, 2022), Why the Jan. 6. Committee Hired James Goldston to Produce the Hearings - The New York Times (nytimes.com); David Folkenflik, *A Former TV News Executive is Producing the Jan. 6 Hearings*, NPR (June 8, 2022), A former TV news executive is producing the Jan. 6 hearings : NPR.

conduct for which the government alleges Mr. Johnson is responsible—yielded immense national and local media attention as well as clickbait headlines referencing the officer's characterization of the day's events as a "war scene" and "carnage."[17] This is a far cry from the "unemotional" reporting on Enron's collapse and the white collar crime allegations against its management as described by the Court in *Skilling*. 561 U.S. at 371-72, 382.

The aftermath of January 6, including the media attention, rhetoric, and effect on the potential community of jurors is more similar to the atmosphere the court confronted in *United States v. McVeigh*. 918 F. Supp. 1467 (W.D. Okla. 1996). In *McVeigh*, the defendant, Timothy McVeigh who was portrayed as a White Nationalist militia man.[18], sought revenge on the federal government,[19] and attacked a federal

---

[17] *See, e.g.*, Tom Jackman, *Capitol Police Officer C\*\*\*\*\*\* E\*\*\*\*\*\* Recounts Jan. 6 'War Scene,'* Wash. Post (June 10, 2022), Capitol Police officer C\*\*\*\*\*\* E\*\*\*\*\*\* recounts Jan. 6 attack - The Washington Post; Brett Samuel, *C\*\*\*\*\*\* E\*\*\*\*\*\* Testifies Jan. 6 Chaos Was Like 'a War Scene'*, The Hill (June 9, 2022) C\*\*\*\*\*\* E\*\*\*\*\*\* testifies Jan. 6 chaos was like 'a war scene' | The Hill (at the government's request Mr. Johnson has removed the officer's full name from the citations. Should Court wish to have full citations counsel can provide them in either an *ex-parte* or public filing);Farnoush Amiri, *Capital Officer Recounts 'War Scene' of Jan. 6 in Testimony,* NBC Washington (June 10, 2022) Capitol Officer Recounts 'War Scene' of Jan. 6 in Testimony – NBC4 Washington (nbcwashington.com) (including video footage of the officer's testimony before Congress).

[18] *See id.*; *see also* Michael Barkun, *Oklahoma City and the Rise of the Militias* 255–290 (1997); *see also* Mark Lawson Fetter, *The Criminal Behavior and Motivations Behind McVeigh's Decision to Bomb the Murrah Federal Building*, Cal. State Univ. (June 2002).

[19] *See The McVeigh Letters*, Guardian (May 6, 2001), The McVeigh letters: Why I bombed Oklahoma | World news | The Guardian; *see also* Michael Barkun, *Oklahoma City and the Rise of the Militias* 255–290 (1997); *see also* Mark Lawson Fetter, *The Criminal Behavior and Motivations Behind McVeigh's Decision to Bomb the Murrah Federal Building*, Cal. State Univ. (June 2002).

building, killing 168 government employees and their children with a homemade bomb. *McVeigh*, 918 F. Supp. at 1469.

The prosecution portrayed McVeigh as an outsider extremist, just like those who participated in the events on January 6.[20] And the court in *McVeigh* was so persuaded by these dynamics that, despite significant national news coverage of the bombing, and despite the fact that a small percentage of Oklahoma City residents worked for or had connections to the federal government, the district court granted McVeigh's motion to transfer venue from Oklahoma, observing that "[t]he effects of the explosion on that community are so profound and pervasive that no detailed discussion of the evidence is necessary." *McVeigh*, 918 F. Supp. at 1470.

Media and prejudicial views of January 6 defendants are certainly not confined to this District, but as will be discussed below, data indicates they are significantly more pervasive and more negative here.  In short, this is a case in which "a pattern of bitter prejudice throughout the community . . . render[s] the voir dire an unsatisfactory device for selection of an impartial jury." *United States v. Ehrlichman*, 546 F.2d 910, 916 n.8 (D.C. Cir. 1976). This is especially so where one of the government's central witnesses has already testified on primetime television, during proceedings that were widely viewed and reported, regarding events of particular interest to persons in this District. The jury pool in D.C. in particular will include

---

[20] "Prosecutors in the Timothy McVeigh bombing trial Monday began to paint a picture of the defendant as a gun-loving, right-wing extremist who pored over writings celebrating violence." *McVeigh Painted as Gun-loving Political Extremist*, CNN (Apr. 28, 1997), CNN - McVeigh painted as gun-loving political extremist - Apr. 28, 1997.

"readers or viewers [who] could not reasonably be expected to shut from sight" what they have read and seen. *Skilling*, 561 U.S. at 382. In those circumstances, prejudice should be presumed; the extent and tone of media coverage, like D.C.'s size and characteristics, weigh heavily in favor of presumed prejudice.

## III.    The events of January 6 remain fresh in prospective jurors' minds.

In *Skilling*, the Supreme Court noted that the argument for presumed prejudice was weakened by the passage of time: "[O]ver four years elapsed between Enron's bankruptcy and Skilling's trial. Although reporters covered Enron-related news throughout this period, the decibel level of media attention diminished somewhat in the years following Enron's collapse." 561 U.S. at 383. But *Skilling* does not provide a useful analogy for this case: Media attention here was much more intense from the outset, less than two years have passed, and the reckoning over January 6 continues to generate front-page news.[21] The investigation and actions of the House Select Committee regularly feature prominently in print, television, and internet media.[22] At the same time, ongoing criminal prosecutions involving other

---

[21]   *See, e.g.*, Jacqueline Alemany, *Trump Subpoena from Jan. 6 Committee Sets Deadlines for Testimony, Documents*, Wash. Post (Oct. 21, 2022), Jan. 6 committee issues subpoena to Trump for testimony and documents - The Washington Post (appearing in print on Oct. 22, 2022, Section A, Page 1); *see also* Tom Jackman, *Jan. 6 Rioter who Dragged D.C. Officer into Mob is Sentenced to 7 ½ Years*, Wash. Post (Oct. 27, 2022), Albuquerque Head receives 7 1/2 year sentence, second longest for Jan. 6 rioter - The Washington Post; Spencer S. Hsu, *Oath Keepers Seditious Conspiracy Trial Resumes without Rhodes in Court*, Wash. Post (Oct. 25, 2022), Oath Keepers trial resumes after Rhodes tests positive for coronavirus - The Washington Post; Spencer S. Hsu, *Son of Confederate Flag-Toting Man in Capitol on Jan. 6 Sentenced*, Wash. Post (Oct. 24, 2022), Hunter Seefried sentenced to two years after chasing police officer on Jan. 6 - The Washington Post.
[22]   *See, e.g.*, Luke Broadwater & Michael S. Schmidt, *Jan. 6 Panel Issues Subpoena to Trump, Setting Up Legal Battle Over Testimony*, N.Y. Times (Oct. 21, 2022), Trump

January 6 defendants are progressing in the public eye, receiving widespread coverage.[23] Here, the passage of time has not blunted the media attention attendant to January 6. To the contrary, ongoing investigative efforts on the part of the House Select Committee and others has meant a steady—if not increasing—stream of news coverage in national and local media.[24]

The Court should presume prejudice because, for all the reasons discussed above, "voir dire [would be] an unsatisfactory device for selection of an impartial jury." *Ehrlichman*, 546 F.2d at 916 n.8. And since a presumption of prejudice is warranted here, this proceeding must be transferred to another district to comply with Fed. R. Crim. P. 21(a), and the Fifth and Sixth Amendments' guarantees of due process and a fair trial by an impartial jury.

---

Issued Subpoena by Jan. 6 Panel, Setting Up Legal Battle - The New York Times (nytimes.com) (version of article appeared in print on Oct. 22, 2022, Section A, Page 1); Annie Grayer, et al, *January 6 Committee Moves Forward with Secret Service Interviews*, CNN.com (Oct. 27, 2022), First on CNN: January 6 committee moves forward with Secret Service interviews | CNN Politics; Kyle Cheney & Erin Banco, *Trump Team Receives Subpoena from Jan. 6 Committee*, Politico (Oct. 26, 2022), Trump team receives subpoena from Jan. 6 committee - POLITICO.

[23] *See, e.g.*, Spencer Hsu, *Key Oath Keepers Witness Testifies Jan. 6 Plans Potentially 'Treasonous'*, Wash. Post (Oct. 18, 2022), Key Oath Keepers witness Jason Dolan testifies plans were 'treasonous' - The Washington Post; Hannah Rabinowitz and Holmes Lybrand, *Proud Boys Member is First to Plead Guilty to Seditious Conspiracy*, CNN (Oct. 6, 2022), Proud Boys member Jeremy Bertino is first to plead guilty to seditious conspiracy | CNN Politics; Kieran Press-Reynolds, *What to Know as the Oath Keepers' Capitol Riot Sedition Trial Gets Underway*, Insider (Oct. 4, 2022), What to Know About the Oath Keepers' Capitol Riot Sedition Trial (insider.com); Rachel Weiner, Spencer Hsu and Tom Jackman, *Who are the Oath Keepers Going to Trial on Seditious Conspiracy Charges?*, Wash. Post (Oct. 3, 2022), Stewart Rhodes, Jessica Watkins are among the 9 Oath Keepers on trial - The Washington Post.

[24] *See supra* notes 23-25.

## IV.  Survey data confirms that residents of this District are uniquely biased.

Surveys commissioned by other similarly situated defendants starkly demonstrate the unique bias of District of Columbia residents. [25] On behalf of all indigent clients charged in the wake of January 6, the Federal Public Defender for the District of Columbia retained the services of the professionals of Select Litigation ("SL") to survey the District of Columbia jury pool. As explained in Exhibit 1 (data that has been previously filed in other January 6 cases), Select Litigation polled 400 potential District of Columbia jurors and 400 potential jurors in the Atlanta Division of the Northern District of Georgia. Exhibit 1 at 1. The firm also retained the services of a media research firm, News Exposure, to analyze aspects of news coverage concerning January 6. *Id*. The survey compares responses by D.C. residents with those nationally and those by residents of an alternative venue, the Atlanta division in the Northern District of Georgia. *Id*.

An additional survey of potential jurors in the District of Columbia and of potential jurors in three other federal judicial districts was prepared at the request of counsel in another January 6 case, Case No. 21-cr-028. In Lux Research ("ILR") conducted this analysis, comparing potential jurors in D.C. to the Middle District of Pennsylvania, the Southern District of Florida, and the Eastern District of Virginia. *Id*. at  39.

---

[25] Exhibit 1 contains a full summary of both the Select Litigation and In Lux Research data.

Read together, the data establish that there are a number of districts in which bias against January 6 defendants is significantly less pronounced than it is in the District of Columbia, because no matter how they are asked, jurors here show signs of bias markedly higher than potential jurors in a wide variety of other districts. For example, both the SL and ILR surveys probed whether respondents would acknowledge having already formed an opinion that those charged with offenses after January 6 are guilty. The results show that D.C. jurors are *far* more likely than others surveyed to indicate that they already believe these defendants are guilty:

| Percentage of Potential Jurors Biased Toward Guilt: ILR Q3 and SL Q4[26] | | | | |
|---|---|---|---|---|
| DC | MDFL | EDNC | EDVA | MDGA |
| 71.89 – ILR<br>71 – SL | 37.18 | 48.17 | 48.20 | 54 |

The data shows that D.C. residents are outliers. Further, the ILR and SL survey data show that D.C. residents are outliers on *every* question designed by either SL or ILR to assess pretrial bias.[27] These consistent results provide further evidence that individual survey results are not flukes, and not a function of question design.

---

[26] SL asked for D.C. and Middle District of Georgia respondents' opinion on "whether people arrested for January 6 activities are guilty or not guilty of the charges brought against them," and recorded answers for "guilty," or "not guilty," and answers such as "it depends" or "don't know/refused." Exhibit 1 at 7 (regarding Question 4). ILR asked respondents in D.C., the Middle District of Florida, the Eastern District of North Carolina, and the Eastern District of Virginia whether they were "more likely to find a defendant charged with crimes for activities on January 6th guilty or not guilty? Or is it too early to decide?" *Id*. at 33 (regarding Q3).

[27] *See* Exhibit 1.

To the contrary, the results are evidence that, as discussed above, bias in this district is deep-seated.

Not only do D.C. jurors consistently show significantly more bias than jurors in several other districts, but they also show significantly more bias than jurors in a wide variety of demographic areas. For example, whether in the Middle District of Georgia, the district surveyed with the greatest proportion of people identifying as Democrats after D.C. residents (36% to D.C.'s 59%), or in the Middle District of Florida, where only about 26% view themselves as Democrats, rates of bias were universally much less prevalent out of D.C. than in D.C., as reflected above. *See* Exhibit 1. This of course makes sense, as the community in D.C. includes "readers or viewers [who] could not reasonably be expected to shut from sight" what they have read, seen, and experienced. *See Skilling*, 561 U.S. at 382.

## CONCLUSION

For all the above stated reasons Mr. Johnson respectfully moves this Court to transfer this case to another district.

Dated: October 28, 2022.

Respectfully Submitted,

<u>/s/ Lauren E. S. Rosen</u>
Lauren E. S. Rosen
NC Bar No. 46368
Assistant Federal Public Defender
Office of the Federal Public Defender
1650 King Street, Suite 500
Alexandria, Virginia 22314
(703) 600-0800
(703) 600-0880 (fax)
Lauren_Rosen@fd.org