UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 1:21-cr-537 (JMC) |
| | ) | |
| PAUL RUSSELL JOHNSON, | ) | |
| | ) | |
| Defendant. | ) | |

<u>MR. JOHNSON'S POSITION ON SENTENCING</u>

With snacks and a cooler, Paul Johnson traveled to Washington D.C. to attend a rally. Trial Trans., Oct. 30, 2023 (a.m.) at 129:4-8.  He didn't carry a gun, bear spray or zip ties. Nor did he have any defensive gear. Instead, he brought a megaphone because he wanted his voice heard. He did not come to the city intending to break any laws or to cause any harm. Because he has always been a community centered, family man who cares deeply for those around him. *See* Exhibit 1.

On January 6, 2021, as a crowd moved from the rally towards the Capitol, Mr. Johnson joined. As the crowd surged through one unmanned bike-rack barricade, and then a second manned barricade, he joined. And as the Court found, Mr. Johnson was "part of a larger group of individuals who ultimately knocked over the second barricade." Findings of Fact ("FOF") ECF No. 345 at 16. Dozens of individuals pushed against the linked bike rack barricade, Trial Trans., Oct. 25, 2023  (a.m.) at 29:6-9, pushing alongside Mr. Johnson, and even pushing into Mr. Johnson's back. *Id*. at 61:18-25; 62:1-3.

1

The pushing and lifting of the bike rack barricade, the conduct that is the basis for Mr. Johnson's convictions, lasted less than ten seconds. After this seconds-long encounter, Mr. Johnson did not engage in any other violent or assaultive conduct. He remained on the fringes of the protest at the Capitol.

Mr. Johnson never contested his presence at Peace Circle, but he could not reach an agreement with the government and so proceeded to trial and was acquitted of the most serious charge that the government would not negotiate pretrial. He is deeply remorseful for his conduct. He describes that day as the "event that brought me the most shame in my life." Exhibit 2. As his mother-in-law wrote in her letter to the Court "I have never met a more broken man over his conduct that day... It humbles me to hear him say he knows he was wrong and would do anything to change that day. He never makes excuses, he simply says he made some extremely bad choices and his family has paid the price." Exhibit 1 at 2.

There is no doubt that Mr. Johnson's behavior on January 6th was criminal, caused harm, and was wholly inconsistent with how Mr. Johnson has led his life for the decades before that day, and the years that have passed since then. Notwithstanding the Presentence Reports ("PSR") guideline range of 63 to 78 months, the defense submits that a sentence of a significant period of home detention to be followed by a period of supervision including special conditions of intermittent confinement, a fine, and community service, serves the goals of sentencing. Here is why:

*First*,   Mr. Johnson is an asset to his community, a trusted small-business owner, the financial provider to his family, an excellent father, and when needed the caretaker to ███████████████████████████. His personal history and characteristics weigh against a lengthy prison term.

*Second*, the collateral consequences of a felony conviction are significant and promote the goals of just punishment and deterrence. The additional consequence Mr. Johnson faces—███████████████████████████████████ █████████████ weigh against a lengthy sentence of incarceration.

*Third*, a lengthy sentence of incarceration would create unwarranted sentencing disparities.

*Fourth*,   Mr. Johnson's conduct was aberrant. The pushing of the bike-rack barricade, lasted less than ten seconds and is inconsistent with how Mr. Johnson has conducted himself for thirty-eight years. Both before and after January 6, 2021. It is also inconsistent with how he conducted himself on that day, outside of those few seconds.

I.     Mr. Johnson's personal history and characteristics show that a sentence below the applicable guidelines range is appropriate.

A. Despite early obstacles, Mr. Johnson had a positive childhood, demonstrating a strong work ethic from an early age.

Born in Newport News Virginia, Mr. Johnson was not raised by his biological parents. PSR at ¶ 122; Exhibit 2. Since before he could remember he was cared for (and later adopted) by his maternal great uncle. PSR at ¶ 122. Mr. Johnson's biological parents were not mentally or financially equipped to raise their two

children. Exhibit 2. His biological sister was raised by his great grandmother. PSR at ¶ 124.  Though he did not live with his biological mother, Mr. Johnson remained in contact with her through his childhood. PSR at ¶122. Mr. Johnson had less of a connection with his biological father, and lost contact with him when he was approximately twelve years old. PSR at ¶122. He spent much of his adult life trying to reconnect with his biological father who was not particularly interested in having a relationship with his son. *See* Exhibit 2. Mr. Johnson's biological father recently died, and in Mr. Johnson's own words he is "still grieving the loss of the man who should have been my dad, while coming to terms of the reality that this was never fulfilled in my life." Exhibit 2. Adoption can be traumatic. Brodzinsky D., *et. al*, Adoption and trauma: Risks, recovery, and the lived experience of adoption. Child Abuse Negl. (Aug. 2022).[1] "Researchers reported that adopted individuals are overrepresented in mental health settings and manifest higher levels of adjustment problems compared to their non-adopted peers." But, per Mr. Johnson he had "a good childhood."  PSR at ¶125.

Raised in a small trailer park in York County Virginia, Mr. Johnson lived near many family members. Exhibit 2. He shared a household with his adopted parents and brother and sister. PSR at ¶124. His biological sister and grandmother lived right across the street. PSR at ¶124. He was close with his extended family and had a good

---

[1] Available at: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8926933/ (last visited Sept. 3, 2024).

deal of family support. PSR at ¶124 & 125.  Though the family had limited financial resources, they still "had all we needed." Exhibit 2.

From an early age, Mr. Johnson had a strong work ethic. His adopted father owned a tree cutting business, E & E Tree services. PSR at ¶ 123. Mr. Johnson and his adopted brother grew up working in the business. PSR at ¶128 & 144. As his adopted father aged, he became too old to do the physically taxing work. Exhibit 2. Loyal to his  father, and holding a strong sense of duty to repay him for all that he had done for Mr. Johnson throughout his life, Mr. Johnson dropped out of high school in the 10th grade to work full times for his father as a tree climber. Exhibit 2; PSR at ¶128 & 144.  Mr. Johnson officially took over the business in 2012, and has run the tree cutting company ever since. PSR at ¶ 123 & 144.[2]  The business provides a variety of services including tree removal, tree maintenance, pruning and trimming, as well as selling firewood and making lumber.

Before taking over the business, Mr. Johnson worked second jobs as the tree service industry is often seasonal. He worked as a delivery driver for Papa John's Pizza and then worked in the store during the winter. PSR at 145. He worked for a roofing company as a teenager, PSR at ¶ 147, and later spent a year employed with a tow truck company. PSR at ¶ 146. For the past twelve years, Mr. Johnson has run E & E Tree Services, supporting his family and providing employment for residents of his community. *See* Exhibit 1 & Exhibit 3. As his mother-in-law noted, "his identity

---

[2] The website for E and E tress services can be viewed at: https://www.eetreeservices.com/ (last visited Sept. 12, 2024).

is grounded in his ability to care for his family." Exhibit 1 at 1.   As a business owner and service provider, Mr. Johnson is known as dependable, hardworking, honest, and as a "thoughtful, generous person[.]" Exhibit 1 at 6 & 9.

B. Mr. Johnson is a devoted family man who is an asset to his community.

Mr. Johnson's first marriage only lasted four years and ended in divorce in 2017. PSR at ¶126.  Mr. Johnson shares an eleven-year-old son with his ex-wife who now lives in another state. PSR at ¶ 126. Mr. Johnson has primary custody of his son, who sees his mother one weekend a month during the school year and on summer break. PSR at ¶126. In 2021, Mr. Johnson remarried his former classmate and best friend Sommer. PSR at ¶ 127; Exhibit 1 at 1.  Mr. Johnson and Sommer have an "awesome" relationship and a blended family. PSR at ¶ 127.  Together they coparent three children, Sommer's eleven and sixteen-year-old sons from previous relationships, and Mr. Johnson's son. PSR at ¶ 127. ███████████████

███████████████

Mr. Johnson is an excellent father. Those who know him best describe him as a  "great" and "doting" father and a "model dad" who has instilled good values in his children. PSR at ¶ 128; Exhibit 1 at 1 & 3. He is actively involved in his children's lives.  He is a "homework helper, the boo boo kisser, the nightmare rescuer." Exhibit 1 at 2. He coaches his two youngest sons' football teams. Exhibit 1 at 1. He spends time teaching his eldest stepson, ████████████, practical skills to use in the world, including using tools. *See* Exhibit 1 at 1; Exhibit 3. Mr. Johnson and his wife own a home together, PSR at ¶ 153, where they have goats, pigs, mules, chickens, cats and

dogs. Exhibit 1 at 1. The Johnson's have created a loving home for their blended family and by all accounts are wonderful parents. *See* Exhibit 1. As noted by a fellow parishioner (a social worker who previously worked for Child Protective Services), who witnessed an instance of discipline, she "immediately recognized that [Mr. Johnson] and his children share a mutual respect." Exhibit 1 at 6.

████████████████████████████████████████████████████

████████████████████████████. ████████████████████████

████████████████████████████████████████████████████

████████████████████████████ For most of his son's life he has been raised in the blended family the Johnsons have created. *See id*. He has a stepmother, step-brothers, and an extended step family who care deeply for him. *Id*; Exhibit 3. ████████████████████████████████████████████ Exhibit 2. The family his son has known will be torn-apart if Mr. Johnson serves a lengthy sentence of incarceration. *Id*. ██████████████████████████████

████████████████████████████████████████████████████

████████████████████████████

Mr. Johnson also provides enormous support to his wife ██████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████. ████████████████████████

[3] Available at: ████████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████  ████████

████████████████████████████████████

Finally, Mr. Johnson is a caring, supportive, active member of both his extended family and community.  He is "a kind-hearted brother and uncle, always excited to show his youngest nephew how to work farm equipment and tractors, and ensuring both his nieces are happy and healthy." Exhibit 1 at 3. ██████████████ ████████████████████████████████████ the Johnsons cared for their two children so the parents could care for the newborn. Exhibit 1 at 2.

Mr. Johnson is the type of person who goes out of his way to assist those around him who are struggling. He helped a fellow church member, disabled after a surgery, by physically lifting him into and out of his car, Sunday after Sunday, so this man could attend church. Exhibit 1 at 8. After learning a local teenager committed suicide

---

[4] Available at: ████████████████████████████████████████
████████████

he delivered cords of wood to the family for use during the burial service. Exhibit 1 at 6. He escorted a young lady, who lost her father to a car accident, to a daddy daughter dance. Exhibit 1 at 9; Exhibit 3.  Mr. Johnson helped an old partner of his father by hiring him when he needed work, even though he was "up in age" for the industry. Exhibit 1 at 10.  He hired a friend with a drug addiction, helping him find sobriety through work. Exhibit 3. Mr. Johnson is also active in his church community, volunteering to landscape and helping to build new structures. Exhibit 1 at 1 & 9; Exhibit 3. Lastly, "Paul is the type of person who can recognize when others, adults and children alike, need support and will sit with them and talk and pray with them." Exhibit 1 at 17.

Mr. Johnson is dedicated to his family, his business, and his community. *See* Exhibit 1; Exhibit 3. An extended absence due to a lengthy period of incarceration would be an enormous loss to many.

C.  Mr. Johnson's conduct since January 6, 2021.

Mr. Johnson was arrested approximately three months after the events of January 6, 2021, on April 13, 2021. 21-cr-332 (DDC) at ECF No. 5; 21-mj-59 (EDVA). He was detained for a week, until April 19, 2021, when he was released under the supervision of the U.S. Probation Office. 21-mj-59 at ECF No. 8.  Mr. Johnson has been under pretrial supervision for three and a half years, the first year of which included electronic monitoring as a condition. PSR at ¶ 40.  As noted in the PSR, Mr. Johnson has been compliant with his release conditions for the past forty months. PSR at ¶ 41.

Since January 6th Mr. Johnson has had time to reflect on his conduct. After the FBI raid, his arrest, and release, Mr. Johnson came home to scared, frightened children. *See* Exhibit 2. He knew that their fear and pain was his fault. *Id.* Looking back, he now sees how the tumultuous years of the pandemic, the isolation and the financial hardship led him to cling "to a person, a person who I thought could fix things." Exhibit 2. He now understands he "had created an idol out of a man, a flawed man, who had no more power to save than I did." *Id.*

He understands he made extremely bad choices and makes no excuse for his conduct. Exhibit 1 at 2; Exhibit 3. He has expressed his remorse to those closest to him and has learned from this experience. *See* id. What is clear, however, from the years before January 6, 2021, and the years after, is that his actions on that day were aberrant and inconsistent with who Mr. Johnson is, and how he has otherwise conducted himself.

II.      The Offense Conduct.

As Mr. Johnson has acknowledged, his conduct on January 6, 2021, was serious and harmed individuals as well as our country. Exhibit 2. The Court found that Mr. Johnson, along with his codefendants, "were part of a larger group of individuals who ultimately knocked over the second barricade." FOF ECF No. 345 at 16. Mr. Johnson does not dispute that pushing the bike rack barricade was criminal.[5] This was a seconds-long, rash decision made in a sea of charged people, and one that he deeply

_____

[5] Though he persists in his argument that the bike-rack barricade was not a deadly or dangerous weapon.

regrets. *See* Exhibit 2. It is important to note, however, that Mr. Johnson did not come to the Capitol with any type of weapon or defensive gear. He did not come to the Capitol planning to engage in any type of assaultive or violent conduct. And indeed, the seconds-long pushing of the bike-rack barricade was the only potentially assaultive conduct Mr. Johnson engaged in on January 6th (and for the matter, for the decades that preceded that day, and the years that followed).

Finally, the bike-rack barricade, which the Court ultimately found to be a deadly or dangerous weapon, is not "inherently dangerous." That is, when Mr. Johnson first touched the barricade, he was not using a deadly or dangerous weapon. And if he had been pushing the bike-rack barricade alone, without the help of others it seems unlikely this Court would have found Mr. Johnson had used a deadly or dangerous weapon.  His conduct is markedly different, for example, than a person who uses a car to ram a police officer, attacks an officer with a flagpole,  beats an officer with a bat, or purposefully pepper sprayed an officer but the latter examples would also be violations of 18 U.S.C. § 111(b). It is also different than throwing a punch, which would likely incur a lesser violation of 18 U.S.C. § 111(a), because the action in and of itself—of pushing and lifting a bike rack barricade—was not driven by a desire to harm. All the previous examples are.  As will be discussed further below, this is one of the many reasons that the Court should vary below the applicable guideline range.

III.    The Presentence Report.

As set forth in his Objections to the Daft PSR filed on July 5, 2024, and in the addendum to the PSR filed on September 12, 2024, Mr. Johnson lodged objections to the offense conduct section and to the advisory sentencing guidelines as calculated in the Final PSR. ECF No. 377. He also argued that a departure under § 5K2.20, Aberrant Behavior, is warranted in this case. *Id*. Mr. Johnson renews those objections and relies on the previously filed objections.

With respect to the government's objection to the draft PSR—that the PSR incorrectly groups Count 1 and Count 3, ECF No. 378—Mr. Johnson submits that the U.S. Probation Office correctly found the counts involve substantially the same harm and therefore are properly grouped together. PSR at ¶ 86; *See also* § 3D1.2, Application Note 5 (stating that for § 3D1.2(c), is meant to prevent 'double counting' of offense behavior and "applies only if the offenses are closely related").

IV.    A sentence of  home detention followed by a term of supervision to include intermittent confinement, a fine, and community service, serves the goals of sentencing.

Notwithstanding the guideline range in the PSR of 63 to 78 months, PSR at ¶163, the defense submits that a lengthy sentence of home detention, intermittent confinement (weekends in jail), a fine, and a significant amount of community service, alongside the week Mr. Johnson has already served in custody, *see* 21-cr-332 (DDC) at ECF No. 5; 21-mj-59 (EDVA) ECF No. 8, is sufficient but not greater than necessary. First, a lengthy sentence of incarceration is not the only means to dole out just punishment and deter Mr. Johnson and others. Second, the guidelines overstate

12

the harm caused and a sentence within the applicable guideline range would create unwarranted sentencing disparities. Third, the unique circumstances attendant to Mr. Johnson, ████████████████████████████████████, coupled with the aberrant nature of his conduct, warrant a significant variance in this case.

A. Punishment and deterrence

The collateral consequences attached to Mr. Johnson's felony conviction cannot be overstated. Mr. Johnson will be marked as a felon for the rest of his life. A farm owner who previously possessed legal guns, he can never again own a firearm. And perhaps most poignant in the context of this case, Mr. Johnson will be disenfranchised for the foreseeable future. Clearly, exercising his right to vote had been important to Mr. Johnson. District judges have recognized the life-long, damaging impact of a felony conviction can be relevant to sentencing. For example, in another January 6 case, the Honorable Amit P. Mehta observed,

> "[P]eople are all very quick to suggest that the only real punishment is a jail sentence, and it's just not true. People can suffer in many different ways and do suffer in many different ways a result of their conduct and that is something every judge, at least on this court, I believe, understands, and takes into account when they're fashioning the appropriate sentence."

*United States v. Andrew Cavanaugh*, 21-cr-362 (APM), Sentencing, ECF No. 41 Transcript at pg. 29. Similarly, in imposing a variant probationary sentence, Judge Frederic Block of the Eastern District of New York issued a written opinion on the relevance of collateral consequences to his sentencing determination and urged that judges "consider such consequences in rendering a lawful sentence." *United States v. Nesbeth*, 188 F. Supp.3d 179 (E.D.N.Y. 2016). Judge Block wrote:

"There is a broad range of collateral consequences that serve no useful function other than to further punish criminal defendants after they have completed their court-imposed sentences. Many—under both federal and state law—attach automatically upon a defendant's conviction. The effects of these collateral consequences can be devastating. As Professor Michelle Alexander has explained, "[m]yriad laws, rules, and regulations operate to discriminate against ex-offenders and effectively prevent their reintegration into the mainstream society and economy. These restrictions amount to a form of 'civi[l] death' and send the unequivocal message that 'they' are no longer part of 'us.' "

188 F. Supp. 3d 179 at 180 (internal citations omitted) (granting a first offender, convicted of importation of drugs, a non-custodial sentence); *see also United States v. Pauley*, 511 F.3d 468, 474-75 (4th Cir. 2007) (loss of the defendant's "teaching certificate and his state pension as a result of his conduct" is appropriate sentencing consideration consistent with requirement that "the sentence reflect the need for just punishment and adequate deterrence").

The collateral consequence Mr. Johnson will experience, for the rest of his life, are severe and should be considered by this Court in assessing what will constitute "just punishment" and "adequate deterrence."

Also of note, the recently enacted First Step Act implemented multiple prison reform measures, intended to incentivize offenders to engage in rehabilitative programming in order to reduce their sentences. *See* First Step Act of 2018, Pub. L. 115-391, § 404(b), 132 Stat. 5194, 5222 (2018).; *see also* News Release, Nat'l Ass'n of Criminal Defense Lawyers, Congress Passes First Step Act; A Move in the Right

14

Direction for Federal Criminal Justice Reform (Dec. 20, 2018).[6]  However, by virtue of his conviction for assault with a deadly weapon under 18 U.S.C. § 111(b), Mr. Johnson is ineligible for Earned Time Credits ("ETCs") under the First Step Act ("FSA"). *See* Department of Justice Federal Bureau of Prisons, *FIRST STEP ACT Approved Programs Guide*.[7]  This exclusion is especially short-sighted and harsh for an individual like Mr. Johnson who has been under pretrial supervision for over three years, successfully showing the Court he is on a path to rehabilitation.

Though different in form, both supervised release and probation, are a form of punishment as both subject individuals to conditions "that substantially restrict their liberty." *See*, *Gall v. United States*, 552 U.S. 38, 48 (2007). So too is intermittent confinement and home detention. *See* U.S.S.G. §5F1.2 (explaining home detention "may be imposed as a condition of probation or supervised release, but only as a substitute for imprisonment.")

Finally, with regard to general deterrence, there is no empirical basis for the proposition that a lengthy sentence is necessary to provide adequate deterrence. Deterrence is achieved by the credible threat of punishment, not by its severity. Mirko Bagaric, *A Rational Theory of Mitigation and Aggravation in Sentencing: Why Less Is More When It Comes to Punishing Criminals*, 62 Buff. L. Rev. 1159, 1202-03 (2014). In fact, "studies repeatedly show that awareness of potentially severe

---

[6] Available at: https://www.nacdl.org/first-step-act-newsrelease/.  (last visited Sept. 12, 2024).

[7] Available  at:  https://www.bop.gov/inmates/fsa/docs/2021_fsa_program_guide.pdf (last visited Sept. 12, 2024).

sanctions does not produce less crime." *Id.* at 1203; *see also* National Institute of Justice, Five Things About Deterrence (Sept. 2014) ("The certainty of being caught is a vastly more powerful deterrent than the punishment."); Gary Kleck & J.C. Barnes, *Deterrence and Macro-Level Perceptions of Punishment Risks: Is There a "Collective Wisdom"* ?, 59 Crime & Delinq. 1006, 1031-33 (2013) ("[T]here is generally no significant association between perceptions of punishment levels and the actual levels of punishment that the criminal justice system achieves. This in turn implies that increases in punishment levels do not routinely reduce crime through general deterrence mechanisms, because the fundamental link between actual punishment levels and perceptions of punishment levels appears to be weak to nonexistent.")

Indeed, "there is little evidence of a specific deterrent effect arising from the experience of imprisonment compared with the experience of noncustodial sanctions such as probation. Instead, the evidence suggests that reoffending is either unaffected or increased." Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42 Crime & Just. 199, 201 (2013). In fact, studies have shown that therapy, like cognitive behavioral skill-building is more effective in reducing recidivisms than punishment. Patricia Clark, Office of Justice Programs, *National Institute of Justice, Preventing Future Crime with Cognitive Behavioral Therapy*, 265 Nat'l Instit. of Just. J 22 (2010).

Mr. Johnson understands this Court must punish him, but submits that the goals of just punishment and deterrence are served by a sentence well below the applicable guideline range.

B. The recommended guideline range is incongruent with the conduct in this case and a guidelines sentence would create unwarranted sentencing discrepancies.

The guidelines as calculated in the final PSR are driven by the 18 U.S.C. § 111(b) conviction. Violations of this statute include a wide range of conduct including brandishing a firearm, *United States v. Matheny*, 523 F. App'x 996, 999 (4th Cir. 2013), sending a bomb, *United States v. Hamrick*, 43 F.3d 877, 881 (4th Cir. 1995), and using a car as a weapon. *United States v. Arrington*, 309 F.3d 40, 49 (D.C. Cir. 2002). And of course, over Mr. Johson's objection, the same guidelines section applies to all. As discussed above, the conduct here is markedly different than sending a bomb, brandishing a firearm, or using a car as a weapon. It was not the knowing use of an obvious weapon with a clear intent to cause harm. Instead, it was a seconds-long use of an object not inherently dangerous, propelled by a group of individuals.

There are two guideline sections that cover assaults under 18 U.S.C. § 111(b), § 2A2.2 and 2A2.4. If Mr. Johnson's guidelines were calculated under 2A2.4, as he has argued they should be, his base offense level would be a 10, and no other enhancements from that section would apply.[8] Even if the official victim enhancement still applied, his final offense level would be 16 and the resulting recommended guideline range would be from 21 to 27 months, a third of the current

---

[8] Under Section 2A2.4 there are no adjustments for use of a deadly or dangerous weapon, or the double counting of an additional two-points for a conviction under 111(b).

guidelines. As calculated in the PSR the guidelines overstate the severity of the conduct in this case, and this is one of several reasons why the Court should vary far below the applicable guideline range.

In similarly serious cases arising from the events of January 6, 2021, this Court and others in this district have varied well below the applicable guideline range and sentenced defendants with more egregious conduct to terms of prison far shorter than what the government will presumably seek in this case.

In *United States v. Shively*, 21-cr-151 this Court issued an 18-month sentence, 12 months below the low end of the recommended guideline range of 30 to 37 months, ECF No. 84 & 55 at 1, where Mr. Shively "violently assaulted" multiple law enforcement officers.  ECF No. 46 at 3. Specifically, Mr. Shively, stuck one officer in the hand, head, and shoulder area, and grabbed another officer by his jacket while yelling at him. ECF No 46 at 4. He assaulted a third officer by hitting the officer in the face with a baton and kicked a fourth officer with a booted foot. ECF No. 55 at 2. Further while under pretrial supervision, Mr. Shively violated his release conditions by possessing a shotgun and ammunition. ECF No. 55 at 11. Moreover, although dated and thus too old to count for criminal history category ("CHC") points, Mr. Shively had six prior convictions. ECF No. 55 at 17.[9]

---

[9] In another assault case, *United States v. Kaleb Dillard*, 23-cr-49, where Mr. Dillard used a metal tool to smash a window of the Capitol, ECF No. 27 at 3, and grabbed a Capitol Police officer attempting to close the doors of the East Rotunda from behind and threw him to the ground. ECF No 27 at 4, this Court issued a 10-month sentence. ECF No. 42

In United States v. *Philip Young*, 1:21-cr-00617 (DLF), Mr. Young, like Mr. Johnson, "lifted and pushed a metal bicycle rack barricade" into officers. ECF No. 26 at 4.



*A picture of Mr. Young, lifting and pushing a metal bike-rack barricade. ECF No. 35 at 6.*

Later, and unlike Mr. Johnson, Mr. Young  pushed the barricade for a second time. ECF No. 35 at 7. Finally, as he was leaving the area, Mr. Young deflated the tire of a U.S. Government vehicle. *Id*. Mr. Young was allowed to plead to a violation of 18 U.S.C. § 111(a), among other counts. *Id*.  With guidelines of 37 to 46 months, Judge Friedrich issued an 8-month sentence. ECF No. 38.

In yet another case, with considerably worse conduct than Mr. Johnson's, *United States v. Kevin Douglas Creek*, 1:21-cr-00645 (DLF), the Court issued a 27-month sentence. ECF No. 59.  Mr. Creek came to the Capitol with mace, a boot knife, binoculars and radios to communicate with friends if the phones went down. ECF No. 48 at 12.  Mr. Creek grabbed an officer, assaulting him, and drove him back several

feet. ECF No. 48 at 13-14.  Later he shoved another officer, and kicked the officer, causing him to fall to the ground.  ECF No. 48 at 16. When the officer tried to get up, Mr. Creek shoved him back to the ground. *Id*. He later threw a thick strap with heavy metal buckles at officers. ECF No. 48 at 17.

Similarly in *United States v. Alan Byerly*, 1:21-cr-527 (RDM), where Mr. Byerly committed three separate assaults, the court issued a 34-month sentence. ECF No 55.  Mr. Byerly traveled to the Capitol with a stun gun. ECF No. 44 at 3.  He committed his first assault, when along with others, he used an eight foot by ten-foot metal sign as a battering ram against officers creating a barricade on the West Plaza Stairs. ECF No. 47 at 13. Later he grabbed a reporter, who had just been dragged down a flight of stairs, and pushed the reporter backwards, dragged the reporter towards a dense crowd, and put both of his hands on the reporter's face and neck pushing him toward a low stone wall. ECF No. 44 at 4. Lastly, he  activated his stun gun at officers and as officers tried to take the stun gun he charged at them, struck them, pushed them, and grabbed an officer's baton. ECF No. 44 at 5.

Finally, in *United States v. Leffingwell*, 1:21-cr-5 (ABJ), Mr. Leffingwell assaulted two different officers (he punched one officer once and the second two times, the latter occurred when the officer was attempting to detain him) inside the Capitol. ECF No. 26 at 3. With guidelines of 24 to 30 months Judge Jackson issued a 6-month sentence. ECF No. 51.

C. Mr. Johnson's family circumstances, coupled with the aberrant nature of his conduct, warrant a significant variance from the guideline range.

A lengthy sentence of incarceration will leave Mr. Johnson's wife without her primary caretaker ██████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████. In the compassionate release context, courts have recognized the significance of the need to provide care to family members and children. *See, e.g.*, *United States v. Bucci,* 409 F. Supp. 3d 1, 2 (D. Mass. 2019) (granting compassionate release where defendant was the only available caregiver for his ailing mother); *United States v. England*, 2020 WL 4004477, at *3 (D. Mont. July 15, 2020) (granting release where grandparents' ability to care for infant was impacted by child's special health needs and grandparents' financial difficulties); *United States v. Kataev*, 2020 WL 1862685, at *3 (S.D.N.Y. Apr. 14, 2020) (granting release where child had cerebral palsy and leukemia, and child's mother was unable to provide care); *United States v. Walker*, 2019 WL 5268752, at *3 (N.D. Ohio Oct. 17, 2019) (granting compassionate release where inmate's mother had leukemia requiring expensive treatment and he had "an unusual and lucrative job opportunity that would allow him to assist with his mother's medical costs"). That is to say, both the sentencing statute and federal law generally recognize the significance of an individual's incarceration on their family.

And indeed, "[f]amilies are significantly impacted by incarceration." Saneta de Vuono-Powell *et al.*, *Who Pays, The True Cost of Incarceration on Families*. Oakland, CA: Ella Baker Center, Forward Together, Research Action Design (2015) (explaining

incarceration results in economic loss and stability, damaged relationships, and stigma, isolation, and trauma). Research has established that children with incarcerated fathers are at risk for diminished learning capability and employment prospects into adulthood, as well as mental health and behavioral problems. Sara Wakefield & Christopher Wildeman, M*ass Imprisonment and Racial Disparities in Childhood Behavioral Problems*, 10 Criminology & Pub. Pol'y 793, 806 (2011); *see also* Leila Morsy & Richard Rothstein, Economic Policy Institute, *Mass Incarceration and Children's Outcomes: Criminal Justice Policy is Education Policy* (2016) ("[P]arental incarceration leads to an array of cognitive and noncognitive outcomes known to affect children's performance in school, and … the criminal justice system makes an important contribution to the racial achievement gap.").

The unique consequences that would result if Mr. Johnson were to serve a lengthy sentence of incarceration, coupled with the aberrant nature of his conduct, support a variant sentence in this case.

V.    Conclusion

Mr. Johnson has the support of his family and his community.  *See* Exhibit 1. As his mother-in-law wrote in her letter to the Court "I have stood beside him every step of the way throughout this because I believe in him and his impact on my grandsons and the world." Exhibit 1 at 2.  As another friend wrote " I can honestly say that he has much to offer society by remaining in it." Exhibit 1.  Mr. Johnson, understanding the severity of his conduct has already shown the Court through the

more than three years of post-arrest conduct that he is not a danger to the community, but rather an asset.

In the end, "the punishment should fit the offender and not merely the crime," Pepper v. United States, 562 U.S. 476, 477 (2011).  For all the above stated reasons, Mr. Johnson respectfully requests that the Court sentence him to a substantial period of home detention, intermittent confinement, a fine, and community service.

Dated: September 13, 2024.

Respectfully submitted,

PAUL RUSSELL JOHNSON
By Counsel,

/s/ Lauren E. S. Rosen
Lauren E. S. Rosen
Todd M. Richman
Assistant Federal Public Defenders
Office of the Federal Public Defender
1650 King Street, Suite 500
Alexandria, Virginia 22314
(703) 600-0800
(703) 600-0880 (fax)
Lauren_Rosen@fd.org
Todd_Richman@fd.org